IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 22, 2025

## STATE OF TENNESSEE v. LUIS MENDOZA-SANCHEZ

**Appeal from the Circuit Court for Rutherford County**
**No. 85743      James A. Turner, Judge**

_____

**No. M2024-00861-CCA-R3-CD**

_____

A Rutherford County jury convicted the Defendant, Luis Mendoza-Sanchez, of multiple offenses against two victims, a child and her mother, including aggravated assault of the mother, rape of a child and four counts of aggravated sexual assault of the child. He was additionally convicted of violating the Child Protection Act. The trial court sentenced the Defendant to fifty-nine years of incarceration. On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion to sever the trials for charges against the victim and her mother; (2) the trial court erred when it allowed the State to ask leading questions of their own witness; (3) the trial court erred when it limited the Defendant's cross-examination of an expert about the victim's sexual orientation; and (4) the cumulative effect of these errors entitled him to a new trial. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

David L. Clarke, Murfreesboro, Tennessee, for the appellant, Luis Mendoza-Sanchez.

Jonathan Skrmetti, Attorney General and Reporter; George Kirby May, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Sharon L. Reddick, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's inappropriate touching of his girlfriend's twelve-year-old daughter, A.M. For his actions against A.M., a Rutherford County grand jury indicted him for the rape of a child, four counts of aggravated sexual battery, and

violating the Child Protection Act. For the Defendant's actions against his girlfriend, T.P., the grand jury indicted him for aggravated assault and domestic assault.

## A. Motion to Sever

Pretrial, the Defendant moved to sever the trials for the crimes against A.M. (Counts 1-6) and crimes against T.P. (Counts 7-8). In the motion, he asserted that the sexually related offenses against A.M. were not part of a common scheme or plan with the assault offenses against her mother, T.P. He noted that the two sets of offenses occurred on separate dates and were of a completely different nature and character. He further posited that evidence of the assault offenses was not relevant to any material issue regarding the sexual crimes.

The State responded that the offenses were permissively joined. The State asked that Count 7, for aggravated assault against T.P., remain joined with the sexual crimes because it was part of a common scheme or plan with those offenses. The State conceded that Count 8, the domestic assault, should be severed for purposes of trial.

At a hearing on the motion to sever, the Defendant clarified that he wanted Counts 7 and 8 severed from Counts 1-6, but that if the trial court did not sever both Count 7 and 8 from the others, then he would like to withdraw his motion to sever and try the cases together. He expressed his clear desire to try the domestic assault charge with the other charges, if the trial court did not sever the aggravated assault charge.

T.P. testified through an interpreter that she had four children, two of whom still lived at home: A.M., her sixteen-year-old daughter, and A.J.M., her twelve-year-old son. T.P. met the Defendant when she offered him a room to rent in her apartment, and, thereafter, the two became friends. In the fall of 2016, they began a romantic relationship. In June 2018, the two moved from Nashville to Rutherford County. The Defendant lived with her for some period, and he sometimes was alone at home with her children.

In June 2019, while they were living in Rutherford County, T.P. took A.M. to the doctor because she saw that she was having her menstrual cycle. A.M. told the doctor that the Defendant was sexually abusing her. T.P. said that, when she went home, she did not know what to do. She told the Defendant that A.M. had said "something" to the doctor about "abuse or some things" but that T.P. was unsure of what was happening. The two began to argue, and the Defendant threw hot oil on her foot. These facts were the basis of Count 8, domestic assault.

Three days after the hot oil incident, A.M. told T.P. that the Defendant was inappropriately touching her while T.P. went to work. T.P. confronted the Defendant, and

the two got into an argument. The Defendant went to his truck and retrieved a gun. He then grabbed her hair and told her that he would kill her if she called the police. He then saw a vehicle approaching, asked her to forgive him, and left. The following day, T.P. called the police and told them about A.M.'s allegations. These facts were the basis of Count 7 aggravated assault.

During cross-examination, T.P. said that when she spoke with law enforcement officers, they took pictures of her foot. T.P. also recounted her daughter's disclosure of the abuse. She said that, on October 18, 2019, her daughter asked that T.P. not let the Defendant come to their home anymore because she "couldn't take it." A.M. disclosed that the Defendant touched her under her clothing, but T.P. was unsure if she said he penetrated her vaginally.

T.P. recalled that the first time she spoke with the Defendant about it, she did not say that A.M. had accused him of being the perpetrator of the abuse. She told him that A.M. had alleged that someone had abused her but that she was not sure if it was happening at school or somewhere else. The Defendant was cleaning some brushes, and he told her that "they" were going to blame him. She asked him why they would blame him if he had not done anything. The Defendant got upset and threw oil that she was cooking with onto her foot, which burned her. The Defendant left and slept in his truck.

When the Defendant returned, she told the Defendant that the allegations were about him. She said that her other child, A.J.M., had confirmed what A.M. had said, saying he had personally observed the sexual abuse, and added that the Defendant had threatened them. A.J.M. told her that he would hide in the closet and call the police, but they never did anything. T.P. asked the Defendant why he had done this instead of looking for another woman outside their home. The Defendant began to argue with her.

Cody Richardson, a deputy with the Williamson County Sheriff's Department, stopped the Defendant for speeding during the early morning hours of May 5, 2020, after the Defendant had passed him and four other cars. After running his license, Deputy Richardson determined that the Defendant had active warrants in Rutherford County. The Defendant gave the deputy consent to search his vehicle, and the deputy found a .357 loaded Smith & Wesson handgun in the glove compartment. The deputy transported both the Defendant and the weapon to Rutherford County, and he turned them over to a Rutherford County officer.

Steve Crotts, a detective with the City of La Vergne Police Department, testified Officer Golden contacted him the day T.P. made the report, October 19, 2019, and the detective took A.M.'s initial report. The detective believed that the sexual abuse had led to the domestic incident, so he told Officer Golden to take out a warrant for the domestic

3

incident and that he would investigate the sexual abuse. The Defendant was not at T.P.'s house when law enforcement responded, so the detective ensured the warrants were submitted into N.C.I.C., had patrol officers keep a close watch on the house, and waited until the Defendant was taken into custody.

On May 5, 2020, the detective was notified by his lieutenant that the Defendant had been arrested after a traffic stop in Williamson County. He further learned that, at the time of arrest, law enforcement had found a gun matching the description of the gun T.P. said the Defendant used to threaten her. The detective called T.P. to inform her that the Defendant had been arrested, and during that conversation she told him that she had found a picture she had taken of the gun in the Defendant's glove box. She sent him the picture via text message, and it appeared to the detective that the picture was of the same gun law enforcement found in the Defendant's possession at the time of arrest.

Based upon this evidence, the trial court found:

[T]he Court will engage in the procedure as to severability. And the Court is required to determine whether or not the offenses contained in [C]ount 7 and 8 are part of a common scheme or plan related to the alleged sexual allegations.

[O]ne key component of an on-going sexual abuse of a child that is the nature alleged in the indictment, specifically Count 1 and really the multiple . . . sexual battery counts, to achieve the success of those is really to remain undetected. That is prevalent in each one of these types of cases that comes before this Court and many other courts across the state.

And one manner in which a defendant can remain undetected is to strike fear into those that may have knowledge about the allegations or that . . . are the subject of the allegations, in this case being a minor child.

The allegations in Counts 7 and 8 are of assaultive behavior against [T.P.] are directly and factually . . . tied to the factual circumstances in Counts 1 through 6. But for Counts 1 through 6, Counts 7 and 8 would not have occurred. They are not only factually tied together, they are also tied together in time. They occurred within weeks of each other and leading up to the interview with the minor child.

The Court finds that the allegations related to the firearm discovered in [the Defendant's] . . . possession and the allegation that he threatened

4

[T.P.] with the firearm, as well as these allegations of the oil spilled on her foot do constitute a common scheme or plan.

So, then the Court is required to engage into the second phase of this procedure, to determine whether the evidence of one would be admissible in the trial of the others. I guess I could look at this in two ways. If . . . these cases were severed . . . there would be an incredible void in that trial if the State was not allowed to present evidence as to why the aggravated assault or the domestic assault were committed.

However, the Court is going to look at more of whether they were admissible in the trial of the sexual allegations. The Court is required to follow the four[-]step process in Rule of Evidence 404 (b). The first step in that process is to hold a hearing outside the jury's presence. This is a pretrial motion. There's no jury here today. That's been satisfied.

Step two, the Court must determine . . . that a material issue exists other than conduct conforming with a character trait and must, upon request, state on the record the material issue, the ruling and the reason for admitting the evidence.

The Court has done this to some degree. The conduct that constitutes sexual behavior that's alleged in this case and aggravated assault, they are not conforming. But one was done in furtherance of the other.

Again, I fairly stated that these are factual circumstances that are tied together almost inseparably. It would create a void . . . that the State likely could not fill otherwise as to why there was a delayed reporting. So, again, the Court does find it's part of a common scheme or plan.

The third factor, the Court must find proof of the other crime, wrong, or act to be clear and convincing. Based upon the credible testimony of [T.P.], the Court does find that the State has proved those in this hearing by a standard of clear and convincing proof.

And the fourth factor, and likely the most important factor, the Court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice. How it is probatively valuable, again, the court stated that these types of cases, especially Count 1 and especially Count 3 through 6 of on-going sexual abuse . . . and . . . Count 2 isn't included in that.

5

But in order for that on-going abuse to occur, the Defendant must go undetected for some period of time. And, so, the probative value of how that occurred is extremely high. I agree with the State as to that issue.

Comparing that with the danger of unfair prejudice, the court focuses in on the word unfair. The Court does not find that . . . it's prejudicial. And most of the evidence that the State seeks to introduce in many of the trials before this court is prejudicial. Otherwise, we would have no reason to have trials or indictments or warrants.

However, the Court finds that it is . . . not unfairly prejudicial. So, the Court finds that the danger of unfair prejudice does not outweigh the highly probative value of this testimony from [T.P.], from Deputy Richardson, and from Detective Crotts.

So, the Court would deny the motion to sever any of the offenses, and would allow the testimony that's been presented here . . . obviously there may have been some objectionable testimony related to hearsay. I completely get that. And will be happy to entertain a motion during the trial associated with some of the things [T.P.] stated.

But, otherwise the allegations and the proof associated with [C]ounts 7 and 8, the Court would allow those to be introduced in the full trial.

And, certainly, if the . . . State decides not to present one or the other, that's their prerogative. And it sounds like the Defendant is not concerned about Count 8 as far as the admission of it.

Again, the Court is making this determination as to both counts. Even though the State conceded that maybe the domestic assault count maybe should be severed, the Court disagrees, because it . . . sounds to the court like it is a precursor to the aggravated assault. That it is a building up of the entire event that led to the ultimate investigation of this case.

It corroborates the fear asserted by the minor child in the interview that the Court reviewed. And it provides a contextual basis for this entire two[-]month incident.

**B. Trial**

The case proceeded to trial, during which the parties presented the following evidence: A.M., who was sixteen at the time of trial, testified that when she was in the sixth grade, she lived in a house in Rutherford County with her mother, T.P., her sibling, A.J.M., and the Defendant, who was her mother's boyfriend but whom she called, "[D]ad." A.M. recalled "forcible sexual contact" with the Defendant on several instances over a period of time.

At the time, A.M. had a bedroom to herself, and the Defendant would enter her room and say that he wanted to talk. She said he began fondling her chest over her clothes, by cupping them with his hands, and then moved to her genitals. Later, he began to touch both her chest and her genitals under her clothing. The Defendant lifted her shirt and bra and fondled her bare chest or removed her undergarments and fondled her bare genitals in between her legs. A.M. said her mother was at work at the time, as her mother worked the night shift.

A.M. recalled that the instances of abuse occurred in her room, the living room, and her mother's bedroom. She said, on one occasion in the living room, he used his genitals to try to penetrate her genitals. He was not able to go all the way in, but "[h]e was trying to get there." She recounted a similar event that occurred in her mother's bedroom. She was pinned down and the Defendant was on top of her. The door to the bedroom was open, and A.J.M. turned on the lights. She was unsure what A.J.M. saw at the time.

A.M. recalled an occasion when the Defendant asked her to touch his genitals. She said she was in her room, and he again attempted to sexually penetrate her. He asked her to grab his penis, so she did. He asked her if she was "into it."

A.M. said that, during one of the encounters, the Defendant told her that he was interested in her romantically. The Defendant also told her not to tell anyone about the abuse because he did not want to get into trouble. A.M. said that she did not tell anyone about the abuse sooner because of a "deep-rooted fear that something could happen to her [mother] or [her]self." She described the Defendant as getting "very upset over very specific things" and said he responded in "a very aggressive nature" when disagreements arose, which made her hesitant to report the abuse.

A.M. recounted an occasion when her mother was at work and A.J.M. called the police regarding the Defendant. She was in her bedroom and did not know that the police had responded to their home. She heard a knock at the door, and her brother answered. The police said they had gotten a call from the address and asked about everyone's welfare. The Defendant said that there was nothing going on and everyone was fine. The officers left, and A.M. returned to her room. She heard A.J.M. being "very upset," and heard a lot

of yelling, so she went out. She noticed that A.J.M.'s phone had been thrown on the ground in the yard.

A.M. said that, during her doctor's appointment, she told her mother that something was happening but did not tell her everything. On the way home from the doctor, the two spoke about it further, but A.M. still did not give her the details because she was not ready to talk with her about everything that had happened.

A.M. recalled hearing T.P. and the Defendant argue about the allegations while she was in her room. She went outside to see what had happened, and she saw that T.P.'s foot was in "a very bad condition." Days later, she again heard T.P. yell at the Defendant about the allegations. She said her mother was "very upset." At the time, A.M. was in her closet and her mother asked her to come out and talk to them, but she refused. She heard her mother and the Defendant move outside, and she heard yelling and then heard the truck leave. When her mother returned, they decided to call the police the following day.

When law enforcement officers arrived, they looked at T.P.'s foot and asked what was happening. They asked A.M. to write a statement, and she refused at first. They encouraged her, so she wrote a statement describing the abuse. She believed T.P. also gave a statement. A.M. admitted that she did not fully describe the abuse in her statement. She was also "vague" when she answered the questions at the Child Advocacy Center ("CAC"), saying that she was still afraid and recalled the threats made to her by the Defendant. A.M. said that her trial testimony contained her truthful account of the abuse.

During cross-examination, A.M. testified that she lived with the Defendant from the time she was ten until she was thirteen. She agreed that he sometimes traveled for work. She also agreed that, when she disclosed the abuse to her doctor, she told him that the Defendant had "attempted" to touch her, not giving the full story. A.M. said that, when law enforcement arrived to interview T.P. and her, T.P. asked her in Spanish to tell them what happened. She said "no" and never provided the full story. A.M. agreed that in her interview at the CAC she told the interviewer that she had been touched but always over her clothing. She told the interviewer that the Defendant had never asked her to touch his genitals.

In a jury-out conversation, the State informed the trial court that its next witness was A.J.M., who had been diagnosed with autism. The State asked for the court's indulgence to lead the witness as necessary, and the Defendant objected, saying that the State should have to ask the witness open-ended questions just like any other witness. The State offered to start the questioning and only ask leading questions if it was necessary. The trial court found:

The Court would request the State to do its best to not lead the witness. I understand the Court's authority as to this issue. But the Court is also concerned with protecting the rights of [the Defendant]. And I realize that's the court's request. What I would ask of [the Defendant's Counsel], if it gets to an extent that it is extremely leading on some important issues, I would ask that you bring that to the Court's attention, and we can have a sidebar.

I realize that's not a hard and fast ruling on this issue. The Court is willing to give grace given the disability of [A.J.M.], and certainly would not want a witness to go down a path that [would not be relevant to the trial] today.

[I] wouldn't want a witness with this disability and certainly at this age, combine those two together, to . . . jeopardize this jury hearing something that the parties seem to intend to keep out from consideration in this case. Primarily what the State has pointed to, some incident in Davidson County, Tennessee that is not part of this hearing.

So, the Court would allow it. And I'm tempted to hold a jury[-]out hearing just to see how this would go. But I think the Court can make a decision on the fly based upon how this testimony goes. And would just ask the State to do its very best, especially on key issues, to not lead the witness too hard. . . . But I think the State understands . . . .

So, I guess we'll play it by ear and see how this goes. But, again, [Defense Counsel], be vigilant. I will certainly not hold it against you if you come up here and argue this again based upon how the testimony goes.

A.J.M. then testified and said that he called the police after he saw the Defendant on top of A.M. on the bed in his mother's bedroom touching her chest area. He was in the hallway when he saw the touching, and it made him nervous, so he went and hid in his room and called the police. He ended the call when the police answered because he was nervous. Police officers came to his house, and the Defendant answered the door. He said that the police asked the Defendant who had made the call, but the police never spoke with A.J.M. The police left. The Defendant found out it was A.J.M. who had called the police, and he got angry. He grabbed the phone out of A.J.M.'s hand and slammed it on the floor. A.J.M. said that the Defendant used something that seemed like a long ruler to hit him.

A.J.M. said that, when the police officers arrived, they knew that he was the one who had called police. He agreed that A.M. and the Defendant were both fully clothed when he saw them in bed together.

9

Dr. Kathryn Carlson, a pediatrician at the Vanderbilt Pediatric Primary Care Clinic, testified that she was the doctor to whom A.M. first reported the sexual abuse. She confirmed that, on October 16, 2019, A.M. came with her mother for a scheduled appointment regarding some emotional issues. During the appointment, the doctor had to leave the room for a brief emergency and when she returned the demeanor of A.M. and T.P. had changed dramatically. She separated T.P. and A.M. to speak with them, and A.M. disclosed that the Defendant made her feel uncomfortable and had made "attempts at touching her inappropriately." She said that he attempted to touch her breasts. Dr. Carlson said that A.M. did not seem forthcoming and open in disclosing the information, and the doctor got the sense that she was withholding information.

Dr. Carlson said that, per her protocol, she ensured that A.M. would be safe in T.P.'s care and then referred them to a social worker for follow up. The social worker did follow up, but Dr. Carlson did not think that A.M. provided additional information.

During cross-examination, Dr. Carlson agreed that the emotional issues that precipitated the appointment were wholly unrelated to sexual abuse allegations. She also agreed that A.M.'s initial disclosure came only after she had left the room for a brief period. The doctor agreed that she and the social worker did not report the abuse to the Department of Children's Services at that time.

T.P. testified through an interpreter and confirmed A.M.'s account of these events. She added that she met the Defendant when he came to rent a room in her house when she lived in Nashville. The two became friends and later started a relationship when A.M. was almost ten years old. They moved to La Vergne in 2018, and T.P. worked with the Defendant doing painting and light construction work. It seemed to T.P. that the Defendant and A.M. got along well, in part because the Defendant gave A.M. gifts, but as time went on it appeared that A.M. appeared angry with the Defendant.

In hindsight, T.P. recalled unusual circumstances, such as one time when she saw the Defendant in A.M.'s room. He told her that he was going in to get a belt, but she noticed that he was wearing shorts that did not need a belt. She confronted him and told him that his shorts did not need a belt and told him that she did not want to see him in A.M.'s room again. On another occasion when they all went for a swim by a river, the Defendant made a gesture with his tongue when he saw A.M. get up to go in the water. She asked him why he made that gesture, and he told her that she was crazy.

Toward the end of 2018, the Defendant told T.P. that they could no longer work together, and that he would work during the day, and she should work during the night while he took care of the kids. T.P. started working at UPS at night.

10

Around this time, another incident occurred after T.P. and the Defendant were arguing in the kitchen because "he was asking [her] to do things that [she] did not want to do." He got angry while she was cooking, and he threw the hot cooking oil on her. It landed on her left foot and caused her a burn injury, which law enforcement later documented in photographs offered by the State.

T.P. recalled the doctor's appointment and said that when the doctor left the room, A.M. asked her why they were at the doctor's office. T.P. told her that it was because T.P. was concerned about her behavior. A.M. began crying and said she did not understand. She then disclosed the abuse. The doctor returned and spoke with A.M. privately. The doctor told T.P. that the Defendant could not be alone with A.M. in the house.

T.P. said that she wanted to confront the Defendant, but not directly because she was scared in part because of the hot cooking oil incident, so she generally told him that A.M. had mentioned abuse at the doctor's office. He responded by telling T.P. that he was worried that they were going to blame him, and T.P. asked the Defendant why. He appeared nervous, looked at A.M., and then got up and left. The Defendant went to his truck and slept there and did not return to the home.

The following day, the Defendant came at around midnight to return his key to their home. She asked the Defendant why he abused A.M., and the Defendant was quiet. She asked him why he did not look for a paramour outside the home but had to harm them. The Defendant said that he did not want to do any harm to A.M., but he also did not ever deny touching A.M. T.P. became angry and insulted the Defendant. He went back to his truck and picked up a weapon. He then grabbed T.P. by her hair and told her that he would kill her if she called the police. T.P. thought that she was going to die, and she said, "let it end right now." The Defendant then said he was sorry and left.

T.P. went inside and found A.J.M. hiding in the closet, as he was afraid. She called her mother who encouraged her to call the police. She called the police the following day. When they arrived, she was able to describe the gun and she later showed them a picture of the weapon. T.P. said that after the Defendant left that night she never saw or spoke with him again.

During cross-examination, T.P. agreed that when she confronted the Defendant the second time she was frustrated and yelling. She also explained that she was scared to call the police because the Defendant had told her he was going to put her in a "black bag" and that he was going to "cut [her] into pieces and throw [her] into the river."

11

Several officers testified about their roles in this investigation. Officer Christopher Golden, with the La Vergne Police Department, responded to T.P.'s initial call at 8:20 a.m. on October 19, 2019. A.M. translated for T.P. and when the officer learned that the complaint was reporting sexual assault of A.M., who was a minor, he called his supervisor for assistance. His supervisor sent Officer Chang to translate, and Officer Golden took T.P.'s report through Officer Chang. The supervisor also contacted Detective Crotts, who would handle the investigation of the sexual assault allegations.

Officer Golden said that T.P. additionally reported two domestic assault incidents, one of which was aggravated because it involved a weapon. She informed the officer that she confronted the Defendant about the sexual assault allegations and that the Defendant threatened to kill her if she contacted police. She told Officer Golden that the Defendant held a gun to her head, threatened to take her kids, put her in a body bag, and throw her into a river. She showed the officer a picture of the gun, a silver revolver, on her cell phone. The officer saw the injury to T.P.'s foot. Based upon T.P.'s allegations, the officer swore out two warrants against the Defendant, one for simple domestic assault and one for aggravated domestic assault.

Detective Crotts testified that he investigated the sexual assault allegations in this case. A.M. was forensically interviewed and, from the information gleaned in the interview, he determined that no further physical examination was necessary. Because the Defendant's whereabouts were unknown, the detective put a "close watch" on the residence. Detective Crotts noted that the gun found in the Defendant's vehicle at the time of his arrest appeared to match the gun that T.P. provided a picture of, which she said he used to threaten her.

Elizabeth Benton, with the CAC, testified that she conducted a forensic interview with A.M. about these allegations. The State played a video of the interview, which showed Ms. Benton introducing herself to A.M. and the two discussing A.M.'s hobbies, schooling, and life in general. A.M. disclosed that the Defendant had tried to touch her around her breasts. His attempts and touching made her feel "really uncomfortable." She said the touching occurred more than one time and that it was on top of her clothing. She never told anyone because she was scared for her mother, whom the Defendant had threatened with a gun. As the two conversed further, A.M. said that the Defendant had also tried to "grab [her] lower" area on multiple occasions. A.M. said that touching had become "[a] lot more often," almost every day. A.M. then said the touching "most of the time" was on top of her clothing, but sometimes he would "reach in." She sometimes called for her brother to come into the room when the touching occurred so she could get away. She said she asked the Defendant to leave her alone, but he did not listen.

A.M. said she did not like talking about the abuse but then disclosed that the Defendant had touched her private area, indicating to her vaginal area. She said it happened a few times and she was unsure if she could explain it. A.M. said the Defendant would sometimes follow her, and she would tell him to stop. A.M. said the Defendant would come into her room without knocking and ask if she was asleep and then touch her. This touching was on top of her clothing. She told one of her friends about the abuse, and the friend told her to discuss it with a counselor. She declined saying that she did not want to tell anyone about it.

Ms. Benton testified that, frequently, a child victim made additional disclosures after the initial interview, but that she usually only conducted one interview. She described the reasons for this to include if the child has been threatened and the awkwardness of an interview.

Deputy Cody Richardson testified about stopping the Defendant on May 5, 2020, and his subsequent arrest. He recalled that the Defendant's vehicle passed him and about five other vehicles on Murfreesboro Road, so he stopped him for speeding. He learned that he had active warrants out for his arrest from Rutherford County, so he asked him to step out of the car. The Defendant consented to the deputy searching his vehicle, and the deputy found a loaded Smith & Wesson .357 revolver in the passenger compartment.

The Defendant, also testifying through an interpreter, said that he was from Mexico but had lived in the United States for approximately nineteen years. He confirmed he met T.P. when she offered to rent him a room. He said that she pursued him, sometimes after she had consumed too much alcohol. The Defendant said that he was married and had a family in Mexico. T.P. was also still legally married at the time, so she understood and still wanted to be with him. The Defendant said T.P. encouraged him to spend time with her children, but he did not feel like a father figure.

The Defendant said that T.P. had "problems" with him and that she would accuse him of having another girlfriend. She also went through his phone after he went to sleep and called some of the numbers that she did not recognize. The Defendant said he was not in the kitchen when T.P. burned herself by dropping a spoon that she was using to cook. He said that this happened in July or August before the allegations in October.

In October, after the Defendant returned from working in another state, T.P. told him that A.M. had alleged that he had sexually abused her. She began insulting him. He denied the allegations and said he did not want to argue with her. She told him to get his belongings and leave, which he did. He said that he never got a weapon out of his vehicle, much less threaten her with a weapon. The Defendant identified the picture of his gun and agreed it belonged to him.

13

The Defendant denied that he ever assaulted T.P. or that he ever inappropriately touched A.M.

Based upon this evidence, the jury acquitted the Defendant of domestic assault, but it convicted him of violating the Child Protection Act, rape of a child, four counts of aggravated sexual battery, and one count of aggravated assault. The trial court sentenced him to an effective sentence of fifty-nine years of incarceration. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion to sever the trials for charges against the victim and her mother; (2) the trial court erred when it allowed the State to ask leading questions of their own witness; (3) the trial court erred when it limited the Defendant's cross-examination of an expert about the victim's sexual orientation; and (4) the cumulative effect of these errors entitled him to a new trial.

### A.  Motion to Sever

In the Defendant's motion and at the hearing, he asked only that the charge for aggravated assault be severed from the other charges. He told the court that, if the aggravated assault charge were severed, he would additionally ask that the domestic assault charge be severed with it; however, if the trial court did not sever the aggravated assault charge the Defendant asked that all the charges be tried together, including the domestic assault and the aggravated assault. For the first time on appeal, he asserts that the trial court erred when it did not sever the domestic assault charge from the other offenses. He also contends that both the domestic assault charge and the aggravated assault charge did not meet the criteria to be permissively joined for trial with the sexual abuse charges. The State asserts that the Defendant has waived review of the issue of whether the domestic assault charge should have been severed. The State counters that the trial court did not err when it declined to sever the aggravated assault offense and that, if any error exists, it is harmless.

### 1. Waiver

We first address whether the Defendant waived our review of the trial court's decision regarding severance of the domestic assault charge by not raising it below. We agree with the State that this issue is waived because "[i]ssues raised for the first time on appeal are considered waived." *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App.

14

1996); *see* Tenn. Ct. Crim. App. R. 10(b). The Defendant specifically asked the trial court not to sever the domestic assault charge unless it severed the aggravated assault charge. The Defendant said that, if the trial court did not sever the aggravated assault charge, then he would like all the charges tried simultaneously. The Defendant cannot, then, appropriately now argue that the trial court erred when it did not sever the domestic assault charge. This issue would, however, be appropriately raised were this court to conclude the trial court erred when it did not sever the aggravated assault charge.

## 2. Aggravated Assault Charge

We now turn to address whether the trial court erred when it did not sever the aggravated assault charge from the sexual abuse charges for trial. A trial court's decisions regarding permissive joinder or severance pursuant to Tennessee Rule of Criminal Procedure 14(b)(1) are reviewed for abuse of discretion. *Spicer v. State*, 12 S.W.3d 438, 442-43 (Tenn. 2000) (citing *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)); *State v. Quantez Person*, No. W2016-01945-CCA-R3-CD, 2018 WL 447122, at *3 n.2 (Tenn. Crim. App. Jan. 16, 2018). The trial court may exercise its discretion only "when the offenses are parts of a common scheme or plan and when the offense sought to be severed would be admissible as evidence in the trial of the other offenses." *Shirley*, 6 S.W.3d at 247. A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision which is against logic or reasoning and which causes an injustice to the complaining party. *State v. Dotson*, 254 S.W.3d 378, 387-88 (Tenn. 2008). On appeal, we look only to the evidence presented at the hearing on the motion to sever to determine if the trial court abused its discretion. *Spicer*, 12 S.W.3d at 445.

Tennessee Rule of Criminal Procedure 8(b) governs permissive joinder:

(b) Permissive Joinder of Offenses. Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13, if:
(1) the offenses constitute parts of a common scheme or plan; or
(2) they are of the same or similar character.

In a case of permissive joinder, the defendant may nevertheless be entitled to a severance under Tennessee Rule of Criminal Procedure 14(b):

(1) .... If two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others.

15

The principles governing the propriety of permissive joinder differ from those governing a subsequent severance, and therefore "a defendant may have the right to a severance of offenses even when those offenses were properly joined initially." *Spicer*, 12 S.W.3d at 443. "'The primary inquiry into whether a severance should have been granted under Rule 14 is whether the evidence of one crime would be admissible in the trial of the other if the two counts of indictment had been severed.'" *Dotson*, 254 S.W.3d at 386 (quoting *State v. Burchfield*, 664 S.W.2d 284, 286 (Tenn. 1984)). Accordingly, "any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" *Garrett*, 331 S.W.3d at 402 (quoting *State v. Moore*, 6 S.W.3d 235, 239 (Tenn. 1999)). The Rule does not require that each offense be relevant to a material issue in all the other offenses, only that evidence of one offense be admissible in the trial of the others. *Dotson*, 254 S.W.3d at 387 n.5. The trial court must hold a hearing on the motion for a severance and may deny severance only if it determines that:

> (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of one of the offenses is relevant to some material issue in the trial of the other offenses; and (3) the probative value of the evidence of the other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

*Id.* at 387 (footnote omitted) (citing *Spicer*, 12 S.W.3d at 445).

To constitute a common scheme or plan, the offenses must either be: "(1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction." *Denton*, 149 S.W.3d at 13; *Shirley*, 6 S.W.3d at 248.

The State argues that the offenses were part of a continuing plan or part of an ongoing criminal transaction. Rule 14(b)(1) does not specifically define what constitutes a larger, continuing plan. *State v. Eady*, 685 S.W.3d 689, 711 (Tenn. 2024). Crimes which are part of the same criminal transaction are admissible "when it is necessary to provide the trier of fact with a full and essential understanding of the crime on trial." *State v. John Allen Murphy, Jr.*, No. M2007-02416-CCA-R3-CD, 2009 WL 1643442, at *7 (Tenn. Crim. App. June 12, 2009) (citing NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.04[13] (5th ed. 2005)). The appeal of evidence that separate crimes were parts of a common plan lies in how it can establish a logical connection between instances of criminal conduct so as to support an inference that because a defendant engaged in certain conduct, he likely engaged in other conduct. *Eady*, 685 S.W.3d at 711 (citation omitted).

Such evidence of other crimes, however, "'should be limited to those so inextricably connected in time, place, or manner that the jury would be unable to comprehend the essential nature of the charged crime without hearing evidence of the "other" crime.'" *Id.* at \*8 (quoting NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.04[13] (5th ed.2005)). "[A] larger, continuing plan or conspiracy 'involves not the similarity between the crimes, but [rather] the common goal or purpose at which they are directed.'" *Eady*, 685 S.W.3d at 711; *State v. Denton*, 149 S.W.3d 1, 15 (Tenn. 2004) (quotations omitted). In other words, the plan "'operat[es] towards the future with such force as to make probable the crime for which the defendant is on trial.'" *State v. Prentice*, 113 S.W.3d 326, 331 (Tenn. Crim. App. 2001) (quoting *State v. Hoyt*, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995). A shared motivation for two otherwise unrelated crimes is not sufficient, but "[e]ach of the consolidated offenses must serve to further the goal or plan in existence at the time of the commission of the first offenses." *State v. Timothy Leron Brown*, No. M2017-00904-CCA-R3-CD, 2019 WL 1514551, at \*28 (Tenn. Crim. App. Apr. 8, 2019), *perm. app. denied* (Tenn. Aug. 15, 2019).

Here, the evidence at the hearing established that the Defendant sexually abused the minor victim and told her not to disclose the abuse. As the trial court noted, to achieve the sexual battery, the Defendant must remain undetected. One of the ways to remain undetected was to create fear in the victim and T.P., so that they did not disclose the allegations. When T.P. approached the Defendant about A.M.'s allegations, the Defendant became angry, left, and then returned and held a gun to T.P.'s head. He told her that he would kill her if she called the police and reported the sexual abuse allegations. We agree with the trial court that the Defendant's actions in assaulting T.P. were designed to make her not disclose the sexual abuse to A.M. This makes them part of a larger, continuing plan.

We now turn to address the primary inquiry in a question of severance under Rule 8(b)(1), which is whether the evidence of one crime would be admissible in the trial of the others, and the requirement that evidence of one of the offenses be relevant to some material issue in the trial of the other offenses and the balancing of the probative and prejudicial value of the evidence is in essence an analysis under Tennessee Rule of Evidence 404(b). *See Spicer*, 12 S.W.3d at 445 (enumerating the three required findings by the trial court and citing Tennessee Rule of Evidence 404(b) as authority for requiring that the evidence be relevant to some material issue and that its probative value not be outweighed by any prejudicial effect).

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). This is to prevent the jury from convicting the defendant of a crime based on propensity rather than proof of guilt of a specific offense. *Garrett*, 331 S.W.3d at 402

17

(citing *Dotson*, 254 S.W.3d at 387). "Accordingly, any doubt about the propriety of the consolidation of similar offenses over a defendant's objection should be resolved in favor of the defendant." *Id.* at 403. Rule 404(b), however, permits evidence when offered to prove some issue other than character or propensity relevant to trial. *Moore*, 6 S.W.3d at 239. Material issues on which 404(b) evidence may bear include: "(1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation." *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004) (appendix); *State v. Gilliland*, 22 S.W.3d 266, 271 n.6 (Tenn. 2000). If the offenses sought to be severed are not relevant to prove a material issue in conformity with Rule 404(b), then severance should be granted. *See State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003) (the defendant's two separate acts of child abuse were not relevant to identity, intent, or any other material issue, and the two offenses should have been severed).

In evaluating propensity evidence, the trial court must adhere to the following procedure:

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

The trial court held a pretrial hearing on the matter, which was outside the presence of the jury. It determined that the sexual offenses and the assaults were committed in furtherance of each other, as the Defendant committed the assaults in response to T.P. saying she was going to disclose the Defendant's abuse of A.M. As the trial court noted, there would be a void that the State could not fill if these offenses were tried separately. It would be hard to explain why the Defendant threatened T.P. with a gun, saying that he would kill her if she called the police, without understanding why T.P. intended to call the police. This evidence shows the Defendant's motive in committing the aggravated assault and it completes the story of the offenses. Similarly, it completes the story with regard to the sexual abuse charges, because it shows why the victim was in fear and initially did not disclose the abuse, and then did not disclose the entirety of the abuse.

18

The trial court did not err when it found that the proof of the crime was clear and convincing based upon T.P.'s testimony, which it found credible. It similarly did not err when it found that the probative value of the evidence outweighed its unfair prejudice. The trial court noted, and we agree, that this evidence is highly probative as to how the abuse went undetected and why A.M. did not disclose the abuse. The assault charges were prejudicial, it found, but not unfairly so. We agree.

Accordingly, we conclude, as did the trial court, that the aggravated assault charge and the sexual abuse charges were part of a larger, continuing plan. The Defendant committed the sexual abuse and then he committed the aggravated assault offense by threatening T.P. when she said she was going to report the sexual abuse allegations. The Defendant is not entitled to relief on this issue.

### B. Direct Examination of A.J.M.

The Defendant contends that the trial court erred when it allowed the State to ask A.J.M., who had been diagnosed with autism, leading questions during direct examination because the trial court did nothing to verify that A.J.M. had autism or the severity of his autism. The State counters that the trial court properly exercised its discretion in this regard. We agree with the State.

During a jury-out hearing before A.J.M.'s testimony, the State informed the trial court that A.J.M. was twelve years old and had been diagnosed with autism. The State asked to lead the witness as necessary, in part to ensure that the witness did not testify about incidents that occurred in Davidson County for which the Defendant was not on trial. After hearing the parties, the trial court said it would provide some leniency to the State, "especially on key issues," but it encouraged the Defendant to be vigilant in raising an objection to any leading questions.

"[T]he propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to appellate review for abuse of discretion." *State v. Caughron*, 855 S.W.2d 526, 540 (Tenn. 1993); *see State v. Hutchison*, 898 S.W.2d 161, 172 (Tenn. 1994); *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); *State v. Barnard*, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994); *see also* Tenn. R. Evid. 611(a) (stating that the trial court has authority to "exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel"). Consequently, absent a clear abuse of discretion that results in manifest prejudice to the accused, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984).

Tennessee Rule of Evidence 611 (c) states that "Leading questions should not be used on direct examination of a witness except as may be necessary to develop the witness's testimony." In Tennessee Law of Evidence, § 611.6 (2nd ed. 1990), the writers suggest that leading questions may be used to shorten the time needed for a witness to testify or to facilitate the direct examination of a young or otherwise impaired witness.

In this case, the witness's mother testified during a pretrial hearing that he had been diagnosed with autism. The State asserted that because the child witness had been diagnosed with autism, he might be more prone to bring unrelated events that occurred in a different county. The trial court allowed the State some leniency, but it asked the Defendant to object to specific leading questions if it found them objectional. The Defendant did not object to any specific questions and does not point to any on appeal. A.J.M. was a young witness who had an impairment. The trial court did not err when it allowed the State some leniency to direct the witness, and our review of the transcript supports the trial court's ruling. The Defendant is not entitled to relief on this issue.

## C. Cross-Examination of Expert

The Defendant contends that the trial court erred when it limited the Defendant's cross-examination of an expert about the victim's sexual orientation. He asserts that the expert's testimony that A.M. came to an appointment to discuss "emotional issues" opened the door to him questioning her about the cause of her emotional issues.

During a jury-out hearing, the expert testified that A.M.'s appointment was made due to behavioral concerns related to her expressing questions about her sexuality. The trial court found that the questioning regarding her sexuality was relevant but should be excluded because the probative value was substantially outweighed by the unfair prejudice, confusion of the issues, or misleading the jury. The trial court, however, allowed either party to question the expert about whether the emotional issue was related to the alleged sexual abuse. After the jury-out hearing, the Defendant asked the expert about the impetus of the appointment, and she testified that the concerns for setting the appointment were unrelated to any kind of sexual abuse allegation.

A defendant's constitutional right to confront witnesses against him includes the right to conduct meaningful cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, (1987); *State v. Brown*, 29 S.W.3d 427, 43 0-31 (Tenn. 2000). "Generally speaking, a denial of the right to an effective cross-examination is 'constitutional error of the first magnitude and amounts to a violation of the basic right to a fair trial.'" *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (quoting *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980)). However, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account

such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). The propriety, scope, manner, and control of the cross-examination of witnesses rests within the sound discretion of the trial court. *Dishman*, 915 S.W.2d at 463 (citing *Coffee v. State*, 216 S.W.2d 702, 703 (1948) and *Davis v. State*, 212 S.W.2d 374, 375 (1948)). Absent a clear abuse of discretion that results in manifest prejudice to the defendant, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984) (citing *Monts v. State*, 379 S.W.2d 34 (1964)).

Considering what occurred at trial, we conclude that the trial court did not abuse its discretion when it sustained the State's objection to the Defendant cross-examining the expert about the victim's sexuality. The trial court clearly limited its ruling and encouraged either party to question the expert about the fact that the impetus of the appointment was wholly unrelated to any sexual abuse allegation. The Defendant did so, and the expert testified that the victim's emotional issues were not related to any sexual abuse allegation. We conclude that the trial court did not err in its ruling, and the Defendant is not entitled to relief on this issue.

## D. Cumulative Error

Finally, the Defendant contends that he is entitled to relief due to the cumulative effect of the errors. Because we have found no error, we need not determine if the Defendant is entitled to relief based on cumulative error. This issue is without merit.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_s/ *ROBERT W. WEDEMEYER*__
ROBERT W. WEDEMEYER, JUDGE